```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF KENTUCKY
                     CENTRAL DIVISION at LEXINGTON


WILLIAM I. NERLICH,              )
                                 )
     Petitioner,                 )    Civil Case No. 12-CV-325-JMH
                                 )
v.                               )
                                 )
FRANCISCO QUINTANA, Warden,      )    MEMORANDUM OPINION
                                 )         AND ORDER
     Respondent.                 )
```

    ****    ****    ****    ****

William I. Nerlich is an inmate confined at the Federal Medical Center in Lexington, Kentucky. Proceeding without counsel, Nerlich filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging a prison disciplinary conviction for escape. [R. 1] Nerlich has paid the $5.00 habeas filing fee.

The Court conducts an initial review of habeas corpus petitions. 28 U.S.C. § 2243; *Alexander v. Northern Bureau of Prisons*, 419 F. App'x 544, 545 (6th Cir. 2011). The Court must deny the petition "if it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts (applicable to § 2241 petitions pursuant to Rule 1(b)). The Court evaluates Nerlich's petition under a more lenient standard because he is not represented by an attorney. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Burton v. Jones*, 321 F.3d 569, 573 (6th Cir. 2003). At this stage, the Court accepts the petitioner's

factual allegations as true, and his legal claims are liberally construed in his favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Having reviewed the petition, the Court must deny relief because Nerlich's disciplinary conviction was entered in conformity with his due process rights.

I

On December 10, 2010, Nerlich was confined at the Federal Prison Camp in Jesup, Georgia. [R. 1-1, p. 2] During a period when he was assigned to work duties at the camp's Powerhouse, prison staff were unable to locate him during a head count. When Nerlich failed to turn up during subsequent searches, a Report of Incident was issued indicating that Nerlich was suspected of attempting escape. [R. 1-2, p. 60-62] After he was located near the prison grounds several hours later, he was issued Incident Report 2100542 for committing a Code 102 offense, Escape from a Secure Institution. Records indicated that the Incident Report was delivered to Nerlich the next day. [R. 1-2, p. 25]

Because of the seriousness of the offense, prison disciplinary proceedings were deferred pending a decision whether Nerlich would face criminal prosecution for his actions. [R. 1-2, pp. 7, 35] Once federal prosecution was declined on January 12, 2011, [R. 1-2, p. 36] the matter was referred to the Unit Disciplinary Committee ("UDC") for prison disciplinary proceedings. However, because the offense carried potential sanctions more severe than can be issued by the UDC, it was referred to a Disciplinary Hearing Officer

("DHO") for further proceedings. [R. 1-2, pp. 26, 37-38]

On January 27, 2011, Disciplinary Hearing Officer ("DHO") Schleder convened a hearing on the escape charge. However, the hearing was adjourned when Nerlich objected that he had not received a copy of the Incident Report in a timely manner prior to the hearing. [R. 1, p. 4] Prior to the reconvened DHO hearing, Nerlich submitted a written statement indicating that he did not leave the camp, but simply fell asleep in the warehouse while performing his job duties, and did not hear officers calling for inmates to return for a head count. Nerlich also contended that the evidence was insufficient to support the charge in several particulars. [R. 1-2, pp. 30-33] In addition, on February 1, 2011, Nerlich signed forms indicating that he had been advised of his rights at the hearing, indicating that he wished to have officer McFadden represent him at the hearing, and requesting that nurse Walker and several officers testify at the hearing regarding their knowledge of the events occurring on that day. [R. 1-2, pp. 39-41]

The DHO reconvened the hearing on February 24, 2012. [R. 1-2, p. 2] In addition to his written statement, Nerlich testified that he had taken an allergy pill that day, and had simply fallen asleep in the warehouse. Nerlich's staff representative, Officer McFadden, also noted that Nerlich likely fell asleep during the day because he normally works the night shift. She also testified that she inspected the clothing Nerlich wore that day, which had been

stored in an evidence locker, and found it to be clean, supporting Nerlich's contention that he did not escape from the facility through nearby woods. [R. 1-2, p. 4]

The DHO also considered evidence from each of the witnesses Nerlich had requested. None of them testified in person at the hearing, but where possible, each submitted a written statement. The following is a summary of the evidence from each witness:

1. **Officer Brian White.** Nerlich requested that he testify to confirm that he told White that he was going to the Powerhouse after lunch. [R. 1-2, p. 33] In his written statement, White indicated that he didn't recall any such conversation. [R. 1-2, p. 51] The DHO indicated that White was not available to attend the hearing in person, and that Nerlich accepted White's written statement in lieu of live testimony. [R. 2-1, p. 4]

2. **Nurse Walker.** Nerlich requested that she testify to confirm the time when she saw him at the medical center. [R. 1-2, p. 33] In her written statement, Walker indicated that she saw Nerlich for a medical appointment at 11:34 a.m. that morning for a PPD check (a skin test for tuberculosis). Walker also stated that she examined Nerlich again that at 6:28 p.m. that evening for a clinical encounter following the incident, noting at the time that Nerlich had no apparent injury and stated that he had fallen asleep in the warehouse. [R. 2-1, p. 4] Walker submitted written documentation of the visits. [R. 1-2, pp. 55-58] The DHO indicated that Walker was not available to attend the hearing in person, and that Nerlich accepted Walker's written statement and medical records in lieu of live testimony. [R. 2-1, p. 4]

3. **911 caller.** Nerlich requested that the person who called 911 be called to testify to describe the person he or she saw and state what time he or she saw them. [R. 1-2, p. 33] The DHO indicated that this person did not submit further information, nor had he or she given a detailed description of the person seen entering the woods near the prison to the 911 operator, and therefore this information

would not be considered in assessing Nerlich's culpability. [R. 1-2, p. 4]

4. **911 operator.** Nerlich requested that the 911 operator testify as to the time the received the call from the 911 operator and the time they called the prison to advise guards of the sighting. [R. 1-2, p. 33] The DHO did not permit or require this person to testify, concluding that this information was duplicative of that provided by the prison camp's front lobby operator. [R. 1-2, p. 5]

5. **Front lobby operator.** Nerlich requested that he testify as to the time when he received the call from the 911 operator. [R. 1-2, p. 33] Officer M. King served as front lobby operator that day, and he submitted a written statement that he received a call from the Wayne County, Georgia, 911 operator at 12:30 p.m. that day, who informed him that an Officer Reddish had seen a male subject entering the woods outside the prison. Officer King relayed this information to officers Tincher and White shortly thereafter. [R. 1-2, p. 46] The DHO determined that this statement provided the information Nerlich requested and was therefore used in lieu of live testimony. [R. 1-2, p. 5]

6. **Officer E. Kasperien.** Nerlich requested that Foreman Kasperien testify as to the locations he went to when he was directed to send inmates back to the camp, and whether he walked through the warehouse to verify that no one remained inside. [R. 1-2, p. 33] Kasperien submitted a written statement indicating that at 1:02 p.m. that afternoon, he received a call from the Control Center directing him to send all of the inmates under his supervision back to the camp for a head count. Kasperien testified that he then walked through all of the buildings in the area - including the Powerhouse, garage, woodshop, warehouse, and landscape shops - yelling for all inmates to return to the camp, and then advised the Control Center that his area was clear. At 1:20 p.m., the Control Center called and asked him to check again to ensure that he could account for all inmates. Kasperien testified that he then drove back to each building, honked the horn on his Ford pickup truck and walked around each location, and advised the Control Center that he had confirmed that no inmates remained. At 1:45 p.m., the

          Control Center called again requesting a third check for inmates, which Kasperien performed and again found no inmates in any of the buildings or surrounding areas. [R. 1-2, p. 5] The DHO determined that this statement provided the information Nerlich requested and was therefore used in lieu of live testimony. [R. 1-2, p. 5]

7. **Officer Britt.** Nerlich requested that officer Britt describe the condition of Nerlich's clothing when he was first located at the outskirts of the prison and escorted back. [R. 1-2, p. 33] While Britt provided a written statement, it did not provide the information Nerlich had requested, and the DHO therefore excluded his testimony. The DHO noted that the information Nerlich sought through that testimony had been provided through McFadden's personal inspection of Nerlich's clothing articles. [R. 2-1, p. 5]

The DHO noted that the investigation and UDC hearing were delayed between December 10, 2010, and January 27, 2011, because the matter had been referred for possible criminal prosecution, and that the warden had approved the continuation of disciplinary proceedings notwithstanding the delays. [R. 1-2, p. 7] During the course of the hearing, the DHO reduced the severity of the charge from Code 102, Escape from a Secure Institution, to Code 200, Escape from a Camp. The DHO determined that additional 24 hours notice was not required prior to the hearing on the lesser charge because the essential nature of the original and revised charges was the same. [R. 1-2, p. 7]

    The DHO issued his Report on March 18, 2011, in which he found Nerlich guilty of Escape from a Non-Secure Facility. In reaching his decision, the DHO relied upon Officer King's statement that at 12:30 p.m., the 911 operator reported that an inmate had been seen

leaving the camp; Foreman Kasperien's statement that no inmates were found in the work shops, including the warehouse, in three separate searches conducted between 1:02 p.m. and 1:45 p.m; Officer's White's and Lt. Pari's statements that Nerlich was not accounted for in any of three separate head counts and one bed book count conducted at 1:20 p.m. and thereafter; and Camp Secretary P. Milwood-Jones's statement that at approximately 3:00 p.m she found Nerlich walking from the freight cars near the warehouse. [R. 1-2, pp. 7-9] The DHO expressly rejected Nerlich's claim that he was simply sleeping in the warehouse as incredible in light of Foreman Kasperien's repeated searches of that area during the time, and the fact that Nerlich was the only inmate unaccounted for. [R. 1-2, p. 9] He further found uncompelling Nerlich's argument that his clothes or boots would have been soiled had he entered the forest, and noted that while Nerlich claimed he was awakened in the warehouse by two inmates, he never identified these inmates nor called them as witnesses to support his claim that he was sleeping there. [R. 1-2, p. 10] Based on this evidence, the DHO found Nerlich guilty of the offense, and imposed various sanctions which included the loss of good conduct time. [R. 1-2, p. 11] The DHO Report was delivered to Nerlich on March 22, 2011. [R. 1-2, p. 12]

Nerlich appealed his disciplinary conviction through the inmate grievance process, contending that the investigating officer was not impartial, the DHO did not permit him to call witnesses on his behalf, and that all of the evidence against him was either

insufficient to convict him or was fabricated, [R. 1-2, p. 18-19, 15-16], arguments that were rejected at each level. [R. 1-2, p. 17, p. 13]

## II

In his petition,[1] Nerlich contends that during the course of the disciplinary proceedings his due process rights were violated in several ways. In the context of prison disciplinary proceedings that result in the loss of good time credits, the Due Process Clause requires that the prisoner be given: (1) written notice of the charges at least 24 hours before the hearing; (2) an opportunity to present evidence against the charges, whether by live testimony or documentary evidence, unless inconsistent with safety and correctional goals; and (3) a written statement explaining the factual and legal basis for the decision. *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974). The disciplinary conviction must also be supported by at least some evidence. *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455-56 (1985).

First, Nerlich argues that his disciplinary conviction must be overturned because he was not given a copy of the Incident Report

---

[1] Nerlich previously sued several of the officers involved in a civil rights action filed pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). When the defendants moved to dismiss the complaint in part due to Nerlich's failure to overturn his disciplinary conviction through habeas proceedings, the Court dismissed his complaint without prejudice at Nerlich's request. *Nerlich v. Pritchard*, No. 2:12-cv-0006-LGW-JEG (S.D. Ga. 2012). Nerlich filed this action two months later.

within 24 hours after the alleged escape pursuant to 28 C.F.R. § 541.5(a). Nerlich acknowledges that he received the Incident Report by at least December 13, 2010, over two months before the DHO hearing on February 24, 2012, but complains that this was not within the 24 hours permitted under the regulation.

As a threshold matter, Nerlich's argument fails on its own terms: the cited regulation does not give him the **right** to receive the Incident Report within 24 hours, but states only that "You will **ordinarily** receive the incident report within 24 hours of staff becoming aware of your involvement in the incident." 28 C.F.R. § 541.5(a)(emphasis added). This language is not mandatory, and therefore cannot create an enforceable right. As this Court has previously noted,

> The rule, by its terms, therefore permits prison staff to provide a written copy to the inmate more than 24 hours after the incident where circumstances warrant it, such as the prisoner's transfer to another cell block or institution, or other administrative delays which may routinely occur in the operation of a prison.

*Booth v. Patton*, No. 08-02-HRW, 2009 WL 1636391, at *2 (E.D. Ky. June 10, 2009); *see also Wallace v. Fed. Det. Ctr.*, No. 12-1217, 2012 WL 6604501, at *3 (E.D. Pa. Dec. 18, 2012).

But even if this regulation did contain mandatory language, violation of such terms would not offend the Due Process Clause. The Supreme Court has consistently reinforced the distinction between substantive due process rights, which may be conferred by state or federal statute or regulation, and procedural due process

rights, which arise only under the Constitution itself. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Thus, even if the regulation plainly required delivery of the incident report within 24 hours in all instances, the Constitution does not, and thus a failure to adhere to the regulation does not create a claim of constitutional dimension. *Booth*, 2009 WL 1636391, at *2; see also *Brown v. Rios*, 196 F. App'x 681, 683 (10th Cir. 2006) (discussing 28 C.F.R. §§ 541.15(a)-(b), "Even if minor violations of BOP regulations occurred, they would not rise to a constitutional violation under *Wolff*."); *Jones v. Cross*, 637 F.3d 841, 846 (7th Cir. 2011).

Second, Nerlich complains that when Lt. Pritchard was investigating the charge on January 27, 2011, he "request[ed] several witnesses at this stage of the investigation" - the same witnesses he requested for the DHO hearing - but that "these witnesses and their testimony weren't afforded to Nerlich during this stage of the disciplinary process." Nerlich further contends that Pritchard was not an unbiased investigator, a right he contends the Constitution should afford him. [R. 1-1, p. 12]

Both of Nerlich's claims, that he is entitled to have exculpatory evidence gathered on his behalf during the investigation, and that it be done by an unbiased investigator, are without merit. The Due Process Clause does not entitle him to a formal investigation at all, let alone one that provides him with evidence to use to bolster his defense. *Moles v. Holt*, 221 F.

App'x 92, 95 (3d Cir. 2007) (*citing Hill*, 472 U.S. at 454). To the extent Nerlich complains that the officer's statements and evidence presented at the DHO hearing was not provided to him sooner, this claim fails as there is no indication either that he requested to see it himself prior to the hearing or that his staff representative was denied access to these materials. *Cf. Nelms v. Young*, No. 07-1661, 2009 WL 1160682, at *11 (W.D. La. Apr. 29, 2009) (*citing Richards v. Dretke*, 394 F.3d 291, 294-96 (5th Cir. 2004)). And while *Wolff* requires the decisionmaker to be unbiased, no court has extended this requirement to the corrections official who investigates the charge, nor is such an extension constitutionally required where the decision itself is rendered by an impartial tribunal. *Diaz v. McGuire*, 154 F. App'x 81, 84-85 (10th Cir. 2005).

Nerlich's fourth claim is that the UDC would not allow him to present evidence or call witnesses at its hearing. [R. 1-1, p. 13] This claim is frivolous. As previously noted, the UDC summarily referred the disciplinary charge to the DHO for determination because, as a 100-level offense which may result in the forfeiture of good time credits, it involved potential sanctions in excess of those which may be imposed by the UDC. 28 U.S.C. § 541.7(f). If any hearing at all transpired, it would have been cursory in nature. And because the UDC made no determination regarding Nerlich's guilt of the offense and imposed no sanctions, Nerlich could not have suffered any prejudice as a result of the UDC's

actions or inactions, a necessary predicate to establish a due process violation. *Cf. Hatten v. Bledsoe*, No. 1:CV-11-1904, 2012 WL 4747297, at *3 (M.D. Pa. Oct. 4, 2012).

Nerlich's final claims relate the hearing before the DHO. He first claims that he did not receive the incident report and was not made aware of the charges against him. This claim is refuted not only by Nerlich's own allegation that the Incident Report was delivered to him on December 13, 2010, [R. 1-1, p. 4] but also by the subsequent re-delivery of the Incident Report to him on January 27, 2011, after the FBI determined not to pursue criminal charges. [R. 1-2, p. 26]

Nerlich next contends that the DHO should have required either the 911 dispatcher or Deputy Sheriff Reddish (the Georgia police officer who reported the sighting) to testify at the hearing, because Reddish allegedly "describ[ed] the man running back toward the camp from Sunset Boulevard being a black male."[2] [R. 1-1, p.15-16] This argument fails for several reasons. First, there is no evidence other than Nerlich's current assertions that Reddish ever described the man he saw as an African-American, and there is considerable evidence to indicate that he did not. None of the reports generated by the officers involved indicated or suggested that the 911 caller identified the race of the person he saw. [See R. 1-2, pp. 42-50, 52-54, 62] Indeed, the DHO Report stated that

---

[2] Nerlich is a Caucasian male. See http://www.bop.gov/iloc2/ InmateFinderServlet?Transaction=IDSearch&needingMoreList=false&ID Type=IRN&IDNumber=50035-004&x=83&y=4 (last visited March 6, 2013).

the person calling 911 had not provided a detailed description at all. [R. 1-2, p. 4]

Second, Nerlich states that, when Lt. Pritchard was conducting the "investigative phase" on January 27, 2011, he requested that Reddish testify at that time because he had identified "the inmate returning to camp as being a black male." [R. 1-1, p. 12] If Nerlich wished to present this potentially exculpatory information during the hearing, it was his obligation - not the DHO's - to do so. It is notable that the four-page handwritten statement that Nerlich prepared and filed on February 1, 2012, makes no mention of this critical fact as a basis to exonerate himself. [R. 1-1, pp. 30-33] Further, the DHO Report lists and addresses each of the individual grounds upon which Nerlich challenged the escape charge, including those made in his written statement and during the hearing, and no mention is made of Reddish's alleged statement. [R. 1-1, pp. 3-4] This claim was also not made when Nerlich appealed his disciplinary conviction to the Mid-Atlantic Regional Office on May 26, 2011. [R. 1-2, pp. 21-22] Rather, it appears for the first time when Nerlich filed his appeal to the Central Office on October 17, 2011, without any explanation for its prior omission. [R. 1-2, p. 15] There is simply no evidence in the record to support Nerlich's assertion that the DHO improperly excluded exculpatory evidence.

Accordingly, **IT IS ORDERED** that:

1. Nerlich's petition for a writ of habeas corpus [R. 1] is

**DENIED.**

    2.    The Court will enter an appropriate judgment.

    3.    This matter is **STRICKEN** from the active docket.

This the 7th day of March, 2013.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge